GRC, et al. Good morning, Ms. Fast. I see you reserved two minutes for rebuttal, and you can begin whenever you're ready. May it please the Court. In March of 2020, GRC fired Barbara Tillman at the age of 84 after 40 years of successful employment. Ms. Tillman's firing was part of a sequence of events set off a year earlier when GRC's board fired its longtime CEO, Felice Muschietti, who was at the time 69, and replaced her with 39-year-old Ryan Moorhead. An owner and a board member of GRC admitted in his sworn testimony that the board replaced Muschietti with Moorhead to bring about, in his words, the next generation. You said that set off the chain of events, but didn't—isn't it uncontroverted what set off the chain of events was the fact that they lost the Starrett City contract, a third of their revenue, half of her salary was being paid by Starrett City, right? That was the triggering event that focused on her job, right? She had no problems when she—before that happened, she was, I guess, about 80, right? There was no focus on her, right? She had no problems. Before the board brought in Mr. Moorhead, she had no problems. In fact— Before he came in, though, they had this whole restructuring, right? There was a lot of activity before he came in. Javelin was doing a review of the company because they lost a third of their revenue, right? Well, first, we would argue that when Javelin started its review of the company is when Moorhead came in. For all intents and purposes, Javelin was Moorhead. He was the only employee. It functionally employed him to become GRC's CEO. But the sequence of events that was started by—when they lost the Starrett City contract indeed caused Tillman some amount of concern, which is why she asked the board about the security of her position, and in March of 2019, they assured her that there were many important projects for her to continue working on. It wasn't until Moorhead came in and recommended that she be fired in his May 2019 email that the sequence of events that led to her firing was set off. Moorhead also— I feel like ultimately—I know there's a dispute about that email, but isn't it also undisputed that she was offered this consultancy position and she declined that? Ms. Tillman was offered a consultancy position in February of 2020, and she did decline the consultancy position because the consultancy position offered her a third of her then current salary at most and required her to sign a waiver of her discrimination claims. Well, but that was during a period of time where they were doing cost cutting. They'd lost 30 percent of their revenue. I mean, you're not denying that they lost 30 percent of their revenue, are you? We don't have any contemporaneous documentation that shows that they, in fact, lost 30 percent of their revenue. We don't deny that the loss of the Starrett City must have had some impact on the company. The company has turned over no documents that— Your client worked for Starrett City before she came to work for GRC, right? Our client worked for Starrett City before she came to work for GRC. The financial portion of her salary was paid from the Starrett City revenue, correct? Fifty percent of Ms. Tillman's salary was paid by Starrett City, but many other employees of GRC also had their salaries partially or fully funded by Starrett City, and those employees were not fired. For example, Pat LaRusso was 100 percent a Starrett City employee, and GRC agreed to take on 100 percent of his salary. Often in these cases, there's an allegation of a similarly situated comparator who was treated differently. That's not exactly how this case has been framed, but I'm wondering who would be the similarly situated comparators, given that your client headed a department that was essentially restructured out of the company? There's no doubt that Ms. Tillman had specialized skills, and she led a department focusing on those specialized skills. Because her responsibilities were ultimately redistributed to Pat LaRusso, the director of construction, and Warren Haar, an employee who up until close to Ms. Tillman's termination did not have a job title at GRC, we would argue that those two employees would be relevant points to look at in comparing the way that Ms. Tillman was treated and the way that those employees were treated. So have you alleged that your client, for example, was as qualified, if not more so, to be the head of the construction department as LaRusso? We don't argue that our client would have been qualified to lead the head of the construction department. However, GRC has argued that the deficit in the construction department was part of the reason for Ms. Tillman's termination. The construction department was run by Pat LaRusso. Ms. Tillman had only been moved into the construction department in September of 2019. So our argument is that her position should have been retained. If anything, there was more of a reason to dismiss Mr. LaRusso. But so there's two different things I was trying to understand. One argument would be they shouldn't have made the decision to sort of chop up and outsource a significant portion of your client's portfolio, right? And that would be a tough sell, I think, because we don't usually tell businesses how to structure themselves. But the other argument is given the choices that they faced, they shouldn't have chosen her to be the one who essentially lost her job or was asked to become a contractor because she was equally or more qualified than younger people who retained their job. And that's what I'm trying to understand. If that's your argument, who, what, where should she have been put? Sure, sure. So as to the first point that Your Honor made, we don't believe that they did outsource a majority of Ms. Tillman's job responsibilities. Those responsibilities were at least in part distributed to younger coworkers and had been for decades supplemented by consultants. So that change was not new. But they must have been greatly diminished because it was a full-time job for her and it became one part of a much bigger portfolio for LaRusso, for example, who was the director of construction. It can't be a claim that LaRusso absorbed the full measure of what your client did, because that would suggest that your client was requiring a full-time job for something that somebody else did in a very small piece of her job. Our argument is that there was ample work to maintain a full-time role for Ms. Tillman. What kind of work? That's what I'm trying to figure out. The energy-related work could have supported a full-time employee. GRC has argued that it wasn't a revenue-generating work, but that's not the case. There were arrangements that they worked on that did generate revenue for the company or for its owners. In addition, that work had been supplemented by consultants, as I said, for decades. I believe that Your Honor asked earlier what department Ms. Tillman should have been moved into. Our argument is that she should have retained her title. She had had success at the company. They continue, even after her firing, to market their energy-related services to their clients. There was ample work for her to take on, and a jury could certainly find that based on how they've handled her work since her firing. I just want to go back to Judge Robinson's earlier question, because the same thing occurred to me. I think you can correct me if I'm wrong, but I think it's pretty clear as a result of this loss of contract, they were doing a number of different downsizing and outsourcing. I think the district court noted some of the accounting functions were outsourced. The safety manager was asked to become a consultant. They downsized IT. They eliminated an office manager and support staff. Usually, if that type of restructuring is occurring and age is wrongfully being used to make those decisions, you would see that sort of cutting across multiple decisions and younger people being retained. Older age were being outsourced. Their jobs were being outsourced. I know there was the issue about the CEO, the former CEO, but putting that aside, I didn't really see any other people that you could point it to. Isn't that unusual in this type of situation if age is what's motivating these decisions in this economic crisis? There are other examples of individuals who were let go who were in the protected category for age. For example, of the 11 individuals who reported to the CEO position during Morehead's tenure, four of those individuals who were in the protected category for age were fired. In addition, as a result of those changes, the average age of the executive team decreased by almost a decade. That's a tougher statistic, right? Because we can't really untangle... Often when there's turmoil, people choose to leave, not because they're fired, but because it's a good time to leave. And so that figure, the sort of average figure, washes in voluntary departures and involuntary. But this 4 of 11 is kind of an interesting figure. Can you remind me where... Is that alleged in your complaint? Your Honor, that figure is in the record as part of the statistical evidence that was presented. But they didn't diselect Judge Robinson's point. They were terminated or some left the company involuntarily or were terminated? Four of the 11 were actually terminated? Four of the 11 were let go, and that's in Plaintiff's 56-1 from Paragraphs 217 to Paragraphs 231. All right. All right. Let's give Mr. Galligan a chance, and you have your two minutes to rebuttal. Thank you. Thank you, Your Honors, and may it please the Court. My firm represents the defendants in this matter, but it's really Grenadier. That's the focus, or GRC, as my colleague referred to it. Defendants respectfully request that the Court affirm Judge Matsumoto's decision and order from the Court below. Judge Matsumoto's 49-page memorandum and order contains a very thorough analysis of plaintiff's baseless claims and all the points that have been discussed here today already. She was terminated, as Your Honor pointed out. The context of all of this is the dramatic loss of revenue when Grenadier lost the contract to Starrett City. They lost, as you said, at least a third of the revenue in one foul swoop. Plaintiff's argument here continues to ignore the financial distress that provides a context to every fact and allegation in this case. The cost-cutting, as you've acknowledged, was dramatic and severe. Plaintiff actually admitted this reality in her deposition. Page 88, she said, quote, I just knew it was obvious. It's always been obvious. It, Starrett City, was a very important property. When Grenadier lost the Starrett City contract, it was forced to, as you've already determined, forced to conduct three rounds of layoffs, limit and eliminate its severance plan, find a less expensive health plan, reduce vacations, and find a lease to move its office out of Starrett City, and at the same time, finance the conversion of its Starrett City office into residential units. So this was a huge loss. The situation was further complicated by the fact that several management-level employees, as counsel acknowledged, including plaintiff, had 50% of salary paid by Starrett City. But Grenadier offered plaintiff a position with her full salary, and she accepted, and that was in March of 2019. Grenadier retained Javelin to review the management structure. And I would point out that Javelin did not equal Moorhead, when Moorhead was obviously involved in Javelin. But he was at that point acting as a consultant to basically figure out what departments could be maintained, and specifically to review the management structure. So he was in a different role than when he was offered the CEO, Alfred accepted the CEO position in September of 2019. But anyway, going back to Javelin, their recommendations were not to terminate plaintiff, but to move her department of special projects into another department, as you realize. There was no recommendation to terminate her. That's a convoluted interpretation of a bunch of emails that go back to the time when Starrett City was deciding which employees of Grenadier that they would retain when they terminated Grenadier's contract. Interpreting that, I mean, it makes me a little nervous when we're going to rest any sort of analysis on how to interpret that email thread, because that strikes me as getting kind of into inferences from facts. I mean, his name was on the email, he's forwarding it, and he's saying here's the list. Well, it's really, I mean, it's a fair point, but it was plaintiff who made the interpretation that somehow based on this email chain and an attached Excel spreadsheet, I think, or a list of terminations or possible terminations, that was plaintiff's interpretation. That somehow implied or proved that Moore had made a recommendation to terminate. Well, I'm just responding to that. I don't want to make an interpretation of that email. It doesn't, it's not relevant. Okay. Well, you brought it up. I did, but I brought it up just to address it as something that counsel referred to it. And let me just say that even if, sorry, go ahead. I think it does support the inference that pretty early on there was a decision that she was on the short list of people who were slated to be cut. To me, the more interesting question is whether there's evidence that that was on the basis for age rather than her position and earnings and everything else. And so I don't know why you would need to resist the notion that she was on a list early on because that doesn't strike me as, I mean, that's fine. Yeah, no, I think you're right. I think if you look at the record on appeal, you know, Ms. Tillman was actually surprised that she was offered a job by Grenadier in the post-Starrett City era. She was emailing the head of HR, Rod Robertson, saying, am I terminated yet? Am I going to be terminated? And then the board turned around and offered her a position at Grenadier in the post-Starrett City world. So, yeah, she was always, you know, in the discussion on cost cutting. So why isn't it enough to get to the jury? There's restructuring. There's financial challenges. That's a reason to let people go. It obviously isn't an excuse to target people on the basis of a protected category, right? It still has to be nondiscriminatory. Why isn't the statistical evidence, and I haven't actually gone and rechecked it since we just spoke with your colleague, but that four of 11 of the people who reported who were let go were in the protected class, why isn't that the kind of evidence that can create enough of an inference combined with the new generation stuff to take this to a jury? Well, Judge Matsumoto found there was no—this evidence did not arise to even provide an inference of age discrimination on the Prima Facie case. You were talking more about the general evidence, but this is more—and I didn't see the focus on this in the brief—about the four of 11. I didn't see the district court focused on that four of the 11 high-level managers were terminated and they were all in the protected class. Well, the reason for that is because the judge found—she reviewed the evidence and she found that it was flawed, principally because it used terminations that weren't terminations, elder workers such as Igor Winter who left and retired. So the four—I don't know who the four are, but are you disputing the fact that the four that they're pointing to were terminated as opposed to leaving? Are you contesting that or do you agree that at least those four were terminated? I don't know which four they're talking about. I think what the court below said was that it included the older people who had not been terminated but who had left. I understand the problem with the more general statistical evidence and the average age and things like that, but this is a more specific allegation that I didn't see addressed in the papers. Can you address—Ms. Bass also focused on Mr. LaRusso and said that the fact that he was treated differently than her is some evidence of age discrimination. Do you want to address that? Pat LaRusso was head of construction, as Judge Robinson pointed out. That's a core part of Grenadier's business. Energy, when you're looking to cut, you've got to cut departments that are not key to your revenue. Energy was something where the trends over the years had been to subcontract or outsource energy because it's not a revenue-generating business for a company like Grenadier. So their clients benefit from it, but Grenadier itself does not benefit from these energy savings. So it was a much easier transition to eliminate Ms. Tillman's position and outsource the energy part of it. Yes, so Pat LaRusso was overseeing that department and he supervised the consultants that were brought in, the independent contractors who were doing the work. He supervised them. He also may have had bits and pieces of that work as connected to his work in construction. Construction and energy sometimes play a part together in terms of dealing with a particular site. So he may have had involvement before, but he did not assume her work. He did not replace her, as Judge Robinson pointed out. He already had a full-time job. Tillman's job was a full-time job. The vast majority of that work, if not all of it, was outsourced. And also it's important to know that the outsourcing to companies who Grenadier did not pay, those companies made their money on getting Grenadier's clients to sign contracts and they would generate revenue out of those contracts. So it's not as simple as who replaced her. Nobody replaced her. That's what the record evidence reveals. All right, thank you. All right, let's pass. You have two minutes to rebuttal. I'd like to start, Your Honors, by addressing the other individuals and the way that they were treated. There's no dispute that Grenadier retained Warren Haar, a person who took on some of Tillman's responsibilities. He had an ill-defined role. He was known to be a poor performer, and his work, like Tillman's, was supplemented by consultants. There's also no dispute that Grenadier retained Mr. LaRusso, whose department, the construction department, was responsible for the $300,000 deficit that GRC used as a pretext to lay off Tillman. As to the other members of the executive team, this is in the appendix at A134 to 37, the individuals who were let go under Moorhead's leadership were Sam Robin, who was 66, Maureen Ranglin, who was 56, Jenny Mulhern, who was 64, and Ms. Tillman, who was, at the time of the recommendation, 83. Of course, Your Honors, we do not dispute that the loss of the Starrett City contract must have caused some financial difficulties. But the law is clear that even in a situation where a company is in financial distress, there's still a question of whether a person's termination makes sense. Ms. Tillman's termination did not make sense. Is the question whether their termination makes sense, or is the question whether their termination was motivated by an impermissible consideration? Of course, Your Honor. The question ultimately is whether it's motivated by age bias. But if a termination doesn't make sense, as the Court recognized in Leibowitz v. Cornell and in Tarshis and in Danzer, the selection of an individual can be suspect because the reasons don't make sense. In terms of Your Honor's question to counsel as to the evidence that Tillman's termination was motivated by age, Mr. Moorhead made discriminatory comments to Ms. Tillman. He asked her when she planned to retire, when there was no indication that she had – she intended to leave her job. She asked – he asked her if she was able to come into the office. The board – She was working from home exclusively. She had been for a long time. That's correct. Isn't that a fair question? Are you able to come into the office, or are you working from home because you can't? Yes, Your Honor. During her deposition – I don't understand the conclusion you make. I work from home a lot. I'm 76. So I don't – I don't understand that at all. Yes, Your Honor. As Ms. Tillman testified, the question was asked in a manner and a tone that suggested that he was concerned about her capabilities of coming into the office and not – Ms. Tillman specifically testified that he never asked her to come in. He asked her if she was able to. And that, combined with the questions about retirement, combined with the question – the statements by the board that they wanted to usher in the next generation. And Moorhead's – and Your Honors had asked before about the relevance of the email suggesting that Ms. Tillman be fired. The primary relevance of that email is that Moorhead lied about it. He denied ever having made a recommendation that Tillman be fired, and that itself is evidence of pretext. Okay. All right. Thank you. Thank you, Your Honors. Thank you both for reserving the decision. Have a good day.